The next case on the docket is Murfin v. St. Mary's Good Samaritan Hospital. Murfin v. St. Mary's Good Samaritan, Inc. Good afternoon, Your Honors. I'm John Petit. I'm with Greensfelder, Hemphird, and Gale, and I represent the appellee and cross-appellant at St. Mary's Hospital in Centralia. And, Your Honor, I think I can walk you through some of these issues, and it might dispel some of the confusion, but you've asked some very insightful questions, and I'd like to amplify on some of those. But before I do that, you know, what this case is about is about St. Mary's trying to deal with a volatile staff position. Dr. Murfin, who's sitting in the courtroom, with a history of disruptive, harassing, and bullying behavior, and a medical executive that was just unwilling or unable to do what needed to be done to fix it. Could you keep your voice up just a little bit, please? Absolutely, Judge. I apologize for it. That just records. Oh, okay. Okay, that's not going to help us, but thank you. One more question. So what happened is that the hospital warned Dr. Murfin, this is not a one-time incident. What happened here is there was a history with Dr. Murfin. He was extremely difficult when the staff, nursing staff, administrative staff, said, Dr. Murfin, the hospital has these policies, procedures, rules, and you need to follow them. Dr. Murfin didn't think the rules applied to him. So whenever someone told him that or wrote him up for not following the rules, he got very combative, very tempestuous, and there was a lot of anger and confrontation. So this led to some prior disciplinary proceedings against Dr. Murfin. And what happened was Dr. Murfin said, you know, here's how I feel about all the staff at the hospital who write me up for not following the rules or remind me when I'm not following the rules. I think they're rats. I think they're narcs. So what he did was one day he created this plastic telephone, glued two rats to the end of it, and stuck it in the surgery area, the waiting area, the place where the staff congregates around there. And that was his way of sending a message to these people that called him on violating these rules. The other thing he did, and this is all in our briefs and spelled out and supported by the record. The other thing he did, and this is outrageous, he created a fake bomb. He left it on one of the nurses who called him on these things, took a picture of it on her doorstep at home, and brought that picture into the hospital and displayed it again. This was his way of sending a message. It had the names of one of the nurses on the bomb. That was a nurse who reported him, correct? That's correct, Your Honor. And there was a nurse involved in this last incident? Absolutely, Your Honor. And what did Dr. Murfin testify to at the hearing that was ultimately held in this matter? There was, you know, to hear Dr. Murfin's counsel, Mr. Terlizzi, it's almost as if no hearing ever happened in this case. But there was one, and we'll get to that in a minute. But at that hearing, what did Dr. Murfin say about those two incidents? Well, it was better than punching somebody. There was ample evidence that this was a doctor out of control. And what happened in the wake of those two incidents? The MEC took a look at it, Dr. Murfin showed up before the MEC, admitted to doing it. What did the MEC, what was the MEC's corrective action for that, recommended corrective action? Let's make Dr. Murfin apologize. He shouldn't do that. And so the board openly gets this, and they say, wait a minute, there absolutely needs to be an apology. And by the way, if this ever happens again, you're subject to revocation. Your privileges are gone. This is completely unacceptable. And so in connection with that, both the MEC recommended and then the board said, you know what? Let's not reappoint Dr. Murfin for a typical two-year term. Let's do it for starting with three months. And then after those three months, Dr. Murfin displayed a little bit that he was doing a little bit better job in complying with some of the rules and procedures. So they said, okay, we'll reappoint you, but not for the two years, but for an abbreviated one-year period. Why? Because they wanted to see what would happen. This was a follow-up document. He was intimidating, bullying, and harassing the nursing staff. So after he gets reappointed for that one year, after the board has told him, if you do this again, you're subject to revocation. We will not tolerate further instances of behavior like this. Within a couple of months, that's when we have the incident that precipitated the revocation that's at issue in this proceeding. And that incident involved Dr. Murfin becoming enraged, face be red, lip trembling, a man putting his hands on a woman and pushing her back up against the wall while he's screaming at her. This is happening in our hospital. Well, look, this is a small community hospital. The physicians on the staff are always reluctant to take any sort of what they would consider severe action, strong action against one of their own. So the MEC considers this, but all they require him to do at the end of the day, what they recommend to the board, is that Dr. Murfin apologize. Well, Dr. Murfin at this point hasn't even apologized like he was supposed to do for the fake bomb and the phone with the rats on it. Okay? They make the recommendation to the board. The MEC does. But I want to come back to your point, Your Honor, and that is when the MEC met to consider this latest incident where he pushes a nurse in a fit of rage up against the wall, calling people narcs, extremely angry. The nurses testified. They were petrified. The MEC meets to consider this. My gosh, this happened. We have to deal with it. They meet very quickly in the wake of this incident. And there's another incident that happened right after that that's addressed in our briefs. I don't want to bog this down with that right now, where he also lost his temper. And the MEC invites to this meeting the two nurses involved, and they come in, and they talk to the MEC about what happened. The MEC also invites Dr. Murfin to come. He says, no, thanks. I'm not coming. He had a chance right there to talk to the MEC and tell them his side of the story. Now, what's interesting, and I think we need to keep in mind in this matter, is that the other side of the story is not, I didn't do it. It's, yeah, it's essentially how it happened. But they had it coming to them because they were ratting me out. They were narcing me. They were reporting me, and I was upset about that. So even had he come in, he would have essentially admitted to the conduct, which he did eventually anyway. Yeah, that's essentially how it happened. But it's important, and I believe it's a critical inquiry, Your Honor, that he was invited and did not attend. Now, I need you to, you're going to run out of time, so I'm going to ask a couple questions. Sure. They take the position that he was entitled to a hearing before the adverse action. Yeah, that's, I mean, just a simple way to put it. I don't know where that comes from. I don't know where it comes from either, Your Honor. Because as I read the credential manual or their bylaws, it seems to say that the hearing comes after the adverse action. So which is it? It's as it's stated in the bylaws. The adverse action is a triggering event. For a hearing. For a hearing. You don't get the hearing until there's an adverse action. And here's why. Here's why there's some confusion. Okay. Oftentimes, what kind of customarily happens is that the medical executive committee, the MEC, meets, and they can't take action. Only the board can take action. So the MEC will recommend that the board take certain action. And if the MEC were to meet, recommend revocation, then that qualifies, that recommendation qualifies as an adverse action under the bylaws. And that would trigger hearing loss. Right. But what happened here is because the MEC just said, oh, let's give him another slap on the wrist, the board had to step up and take action. We warned Dr. Murfin that if this happened again, he was subject to revocation. Why didn't that trigger the right to a hearing? They had the MEC recommendation. The board, of course, can make an independent decision. But when the board makes a decision as to this type of adverse action, adverse to the doctor, why wouldn't that trigger the due process rights that the trial court found were violated? Because, Your Honor, in this instance, the MEC did not take any action that qualified as an adverse action. What it said is apologize and go get some counsel. I know, but that's not my question. Okay. The board decided differently. The board did decide differently. And it said, we're going to take adverse action here, and that is revoking this physician's privileges. Right. Okay? That triggered a hearing. And there was a hearing. So you're saying that he didn't have a right to appear in front of the board to either say, I agree with the MEC action, I disagree, or whatever? It's just a very summary. We looked at it. We don't think it's enough. The hammer comes down. It's my understanding that the doctor accepted the MEC recommendation. Yeah, the doctor did not contest the MEC recommendation. He, again, MEC's recommendation was let's make him apologize and go get some counsel. Right. Right? So that doesn't trigger any hearing rights. It gets to the board level, and the board says, this is someone who's, you know, assaulting a nurse in a hospital. We need to act quickly. They authorized the president to go get a TRO, if need be, to keep Dr. Berkman out of the hospital. They said, we need to act quickly here. And so they revoked his privileges, as he had been warned would happen if there were any further incidents. Now, that, Your Honor, he did not. Under the bylaws, there's no right for the physician to appear at a board meeting. There just isn't. So when this adverse action is taken, that triggers the hearing rights. And then there was a six-hour hearing on this matter. So why did the court find there was no hearing? That's what I can't figure out. Ma'am, I think what the court was saying is that there wasn't a hearing before the adverse action was taken. But it's not required. Exactly. So what did the court say? I mean, it's important to note, and it's obviously discussed at length in our papers, that there was a hearing on this matter. There was a six-hour evidentiary hearing. And you're right, Your Honor, Dr. Murfin didn't say, when the board said, this is what we've done, you now get a hearing. Dr. Murfin didn't say, well, let's do it fast. Let's do it in, you know, 15 days, 14 days, something like that. He didn't say that. In fact, he chose the latest hearing date that he could have under our notice letter. So you're basically saying that the way the bylaws are written, the board is insulated from any due process requirements in determining an action based on acceptance, modification, or rejection of an MEC recommendation. Is that correct? No, there certainly were due process requirements. It doesn't seem like the doctor has as many rights as someone who's on probation, and a probation revocation is filed against them in criminal court where their presumptions have been wiped away. Your Honor, this is a private hospital. I know that. Right. I know that. So there's that. And these are privileges that we're talking about. And, again, what we're talking about, too, you have to keep in mind the history of what happened here, what the hospital said, what happened if there were further incidents. He was warned. We're going to have zero tolerance for this. If you do something in the future, you are subject to revocation, okay? He did have the opportunity to be heard on this. Now, did that – In front of whom? Well, he had the opportunity to go talk to the MEC, so that was one opportunity, and he rejected that opportunity. He also had an opportunity to be heard on the board's decision. After the decision was made. Absolutely, after the decision was made. Why? Because that's the decision that constituted an adverse action, and it's the adverse action under these bylaws and, by the way, under the Licensing Act, that triggers the hearing rights. I admit it's a little bit out of the way this procedure would ordinarily work. Why? Because typically it's the MEC that says, steps up to the plate, does what needs to be done, and says, we have a problem with the physician here, and we recommend that his privileges be revoked. At that point, that would trigger his hearing rights, because the MEC had recommended revocation. But the MEC here didn't do what, frankly, it needed to do, which was deal with this problem with the physician. The board said, we have to deal with it. Why? We – this doctor needs to be out of our hospital. He is a threat to the staff. Go get a TRO, Mr. President of the hospital, if you need to. The hospital's facing liability if it doesn't step up to the plate. If it allows Dr. Murfin to go back into the hospital and he really hurts somebody, he punches them, slams them up against the wall. I mean, we're – the board recognizes that risk. A couple of things, and I know we've gotten a little bogged down in some of the facts, but I think it's important to understand what happened here, because it's that process, it's the totality of what happened here, the disciplinary issues with Dr. Murfin, that I think shed light on some of the process issues that we're talking about. I do want to address one point, and then I want to go to damages, and that is this issue about the hospital president and a precautionary suspension. What the president of the hospital, Mr. Merrill, testified to is when the MEC met, the MEC decided let's not impose a precautionary suspension. Mr. Merrill was explaining that decision. First of all, it's up to the MEC to say that's the action we want to take, and if they do that, then they can go to the hospital president and implement it. But what he was saying was, well, I kind of didn't think that a precautionary suspension was appropriate because I didn't think any patient life was at stake. Well, that's not even the standing, okay? But there's an important thing to remember. A precautionary suspension is a mechanism that's available to the MEC. Under Illinois law, the board is the entity that takes action. This precautionary suspension procedure is an exception to that. Well, what happens before the MEC, before the matter gets to the board, which is the only entity that can take action, what happens when you have this doctor who's presenting a danger to people? Well, Illinois law says, all right, well, we'll create an exception to the general rule, and the MEC can implement a precautionary suspension before the matter even gets to the board. That's what Mr. Merrill was talking about. Mr. Merrill never said, at the board meeting, the board never determined that there were any serious issues of patient safety. That's exactly what the board decided. The MEC wasn't willing to do that. But when it got to the board level, the board said, we must act now. There's a safety issue here. This is a volatile position. We've been dealing with them for a while. We warned them. Do this again, and you're out. So why didn't the board or Dr. Merrill, Mr. Merrill, whatever he is, actually looking at these requirements and assuming that there are due process rights when a review and potentially adverse action could be taken by the board? Why didn't you go out and get a TRO? This case would have been a lot cleaner if you had. Because it was only if there was a threat that Dr. Merfin was going to come back onto the hospital grounds. That's what the board said. Look, if there's a problem and he's trying to get back onto the hospital grounds, and he's in the hospital, you're authorized to go out and get a TRO. Let me ask you this. Yes, Your Honor. You've made the point, and it's absolutely clear. This is a private hospital. This is a private individual. This is not a state action type of thing. But using state actions as an analogy, can you point to me or to my colleagues any instance in which a preliminary finding and or recommendation is made by a board, a group? This is the MEC. It's subject to review, concurrence, diminishment, or accentuation by another decision-making body, and this is the board. And there is absolutely no notice, no opportunity for the party or the parties to present, and no basically just a summary determination without input by any party involved before that discretionary decision is made. It's not done in workers' comp. It's not done in administrative appeals. It's generally not done with ALJs in state departments. Can you give me an instance, an analogous structural situation in which this would be the norm? Well, yes, let me answer your question. There's two parts to my answer, Your Honor. First, I disagree with some of the predicates to it, that there was no notice. I mean, the letter that went out to Dr. Murphy. No, I'm not asking you to take those or admit those. I'm giving these to you as the basis of my question. Let me just, there's really, I think, three cases or bodies of law that I can point to. One is, even where there's state action, which, as we know, implicates constitutional standards that are simply not implicated here, there are many cases that say, look, a pre-deprivation hearing isn't always required. It pivots on the facts and circumstances of the case, okay? And sometimes a post-deprivation remedy is sufficient. You have to look at the facts and circumstances of each particular case to determine whether a pre-deprivation hearing is absolutely essential on those particular facts and circumstances or not. And there are cases that say, and that we cited in our brief, that say, look, one instance where a post-deprivation remedy is acceptable is where there's public health issues at stake and someone has to act in the safety of public health. And that's what happened here. The board said that NBC wasn't willing to work with the hospital president to impose a precautionary suspension. Well, we as a board, we have the inherent authority to do what needs to be done to make sure Dr. Merkin is not in the hospital pending a hearing. We'll give him a hearing, but he needs to be out right now. And so I think that's one line of cases that would apply. Another line of cases, I think it's the Lowe decision, and it's cited in our briefs. It's a medical staff privileging case, and it's a case where the MEC or the hospital president didn't impose a suspension, but the board stepped in and did. And the court said the board has the inherent authority to do that because the board is the one who has the ultimate authority to act. And whether the bylaws say the board can do that or whether they don't say the board can do that, the board has that inherent authority to act because it's the ultimate decision maker and it's the ultimate action taker. The last area of law that I would point your honor to is in the Health Care Quality Improvement Act context. And this kind of starts to get into the damages issue, and we really have three bases for damages immunity. And I don't know if we need to talk about that here this afternoon because I think that issue is very crystal clear. But even in the Health Care Quality Improvement Act, under that third prong for the immunity, now remember under the Health Care Quality Improvement Act it says, hey, hospital, you get immunity unless the doctor rebutts it. He has to come out and prove by preponderance of the evidence that you don't get it. And one of the prongs that courts look at, the only prong that Dr. Murfin has even raised here, is the procedural prong. And there is a case, Rogers, out of District Court in Louisiana. These are all federal cases primarily. There are some state cases under the HCQIA as well. Rogers involved a situation where a doctor had been placed on probation and told, you know, you've got to clean up your act. And this was a professional behavior case, you know, a doctor who was mistreating staff. And they said, you need to fix this. And the doctor didn't do it. And the hospital, the board, said, okay, you're suspended. And we're not giving you a hearing before we do that. We'll have the hearing afterwards. And the court said, well, look, the HCQIA doesn't say you have to always have a hearing before the hospital or the board takes action. It says, or such other procedures as are fair under the circumstances. And what the court said in that case was, we think this was more than fair under the circumstances. They warned the physician. Don't do this anymore. You're subject to these sanctions. He did it. He didn't fix it. And they stepped in and took the sanctions and then gave him a hearing. Said, okay, now we'll look into this. And we'll give you every opportunity to convince us that we shouldn't have done what we did, which is what we did here. And at the end of the day, Dr. Murphy comes in and says, I didn't do it. It didn't happen this way. It's, yeah, I did it. But they had it coming to them. So I think we did everything that we possibly could here. The hospital, there was a pressing need to take immediate action. That's documented in the board minutes. That section that you read out of our brief round was right out of the board minutes. And they said, this is what we need to do. We're acting for patient safety. And we need to take this right now. And we'll give Dr. Murphy an opportunity to vet all of these issues, tell us whatever he needs to do. He'll have a, he'll only have a six-hour hearing on this. Multiple layers of the television. We have to cut you off. I apologize for. No, it's confirmed, but thank you. Thank you very much for your time. And if there's any other questions or you think of anything, I'm happy to come back up here. Thank you. Okay. The last few minutes. Have a little hike. I'm sure we're all hungry and tired. Can we be crystal clear that the statute clearly, the Illinois statute applies to private hospitals. There's no argument it doesn't. It says a summary suspension, summary obviously means without notice or opportunity to be heard, may not be implemented. And it doesn't say by who, whether it's MEC, the board, ad hoc committee. It says the hospital cannot implement a summary suspension without a documented finding of immediate danger. And the bylaws say exactly the same thing here. It is not a situation where a precautionary suspension may not be implemented unless there's actual documentation mirrors the statutory language. And so your Honor is absolutely correct. There is a due process element here. The only exception is if the fact finder makes a documented decision that there's immediate danger to life, immediate danger exists. And if that happens, then it triggers a whole different set of procedures that were followed here, including a nearly immediate hearing, five days, because it's so serious. You've taken a man's livelihood away. That was not done here. All the items about everything Dr. Murfin did or didn't do is all an attempt to convince this court that their revocation action was justified, was fair, was reasonable under the circumstances. The Supreme Court has told us that's none of our business. We don't address that issue. We don't care whether they were arbitrary and capricious or whether it was a very measured and rational decision. That's irrelevant for this court. Dr. Murfin also filed for a preliminary injunction. Yes. Why didn't he take that forward? What happened, Your Honor, was I think it was five days before the preliminary injunction was set for hearing. It was removed to federal court. Then it was about six or eight months before the federal court finally determined there was not federal question jurisdiction and sent it back to the state court. And by that time, we were ready to argue the merits of the case on summary judgment, which we did. So it was essentially moot. The preliminary injunction also went to not reporting this as an adverse action to the National Practitioner Data Bank, which by the time we were able to get back to state court, that had already been done. It was a fait accompli. But I can't emphasize enough that they can't come back now, two and a half years later, and say, oh, this whole thing was on an emergency immediate danger procedure. When they didn't follow that procedure, when they didn't make that finding, when their own president said, we thought about that and determined it wasn't. And clearly, under their own bylaws, again, an NEC meeting is not a hearing. They themselves define it as not a hearing. So whether you knew about that hearing, and your Honor, you are correct. Dr. Murfin was more than prepared. The testimony at the hearing that ultimately was held, he was prepared to accept the recommendations of the NEC. And the very next day, he gets this letter saying, forget it. You're gone. You're done. You can have a hearing 30, 60 days from now, whatever date's convenient for you. And that's not the law. The law is that if they're going to do that, they've got to document why they're doing it on the basis of immediate danger and has to be supported. And then they have to provide this nearly immediate hearing. And none of that was done in this case. And he's simply saying that I was entitled to some procedural due process. We don't know what would have happened had they had a pre-deprivation hearing here. Maybe something could have been worked out. At least Dr. Murfin would have been there to explain his side. You've heard all this testimony about what he did. We haven't got into the other side of what was going on because it's not relevant for this court. But wasn't – I just don't understand where you claim a pre-deprivation hearing was due under the rules of the hospital. Because the statute said a summary suspension may not be implemented. Unless a summary suspension – you cannot do it unless you make a finding of this immediate danger. And then once you do it, you provide this accelerated route so that the poor guy can – if it's an emergency. But he was given a hearing. I'm talking about the pre-deprivation hearing. Where do you see that a pre-deprivation hearing was done? I understand your argument that the post-deprivation hearing took too long. Where does it say a pre-deprivation hearing has to be done? Because it says you can't do it without this finding, which they specifically said they were not making. Well, that's what's in dispute, I guess. Well, I don't think it is. But it also says, Your Honor, that if you do it, then you have to follow this route. And you're aiming that at the board, not at the MEC? Absolutely. The MEC did nothing wrong here. Thank you. Okay, thank you. All right. This matter will be taken under advisement. And, Your Honor, you should work with. Thank you all for your patience this afternoon. All right.